# EXHIBIT 3

# OPERATING AGREEMENT
## OF
## 291 PERIGROVE 1001, LLC

**THIS OPERATING AGREEMENT** (this "Agreement") of 291 PERIGROVE 1001, LLC, a Delaware limited liability company (the "Company"), is made and entered into as of April 20, 2021 by and among the undersigned Persons (and such other Persons who may be admitted in the future in accordance with the terms hereof), each being hereinafter sometimes referred to individually as a "Member" and collectively as the "Members."

**NOW, THEREFORE**, in consideration of the mutual promises set forth below, the parties hereby agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

1.1   Definitions.   For convenience and brevity, certain terms used in this Agreement are defined in SCHEDULE A instead of when first used in this Agreement. Each defined term used in this Agreement has been identified by capitalizing the first letter in such term.

## ARTICLE II
## FORMATION OF COMPANY

2.1   Formation.   The Company was formed as a limited liability company under and pursuant to the Certificate of Formation and the provisions of the Act. The rights and obligations of the Members shall be as provided in the Act except as otherwise expressly provided in this Agreement. The Members hereby confirm the designation of David Gefner as an "authorized person" within the meaning of the Act to execute and cause to have filed the Certificate of Formation and any other certificate, instrument or document required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Manager shall execute, deliver and file, or cause the execution, delivery and filing of, any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

2.2   Name. The name of the Company is 291 Perigrove 1001, LLC or such other name as may be determined by the Manager.

2.3   Purpose.   The purpose of the Company is to conduct the Business, and to engage in all activities that are related or incidental thereto. The Company shall have all of the powers necessary to accomplish the purpose for which it was formed, and which may be exercised legally by a limited liability company under the Act. Notwithstanding any other provision of this Agreement to the contrary, so long as the Loan is outstanding, the Company may not, without the prior written consent of Lender, engage in any business or activity other than those set forth in this section.

1

2.4     Agent for Service of Process and Office.     The principal office of the Company is located at 351 Spook Rock Road, Suffern, New York, or at such place as the Manager may designate from time to time. The Secretary of State of Delaware is designated as agent of the Company upon whom process against it may be served. The address to which the Secretary of State shall mail a copy of any process against the Company served upon him or her is David Gefner, 351 Spook Rock Road, Suffern, New York.

2.5     Term. The Company's existence commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and, unless earlier terminated or dissolved pursuant to the Act or to this Agreement, the Company shall have perpetual existence.

## ARTICLE III
## MEMBERSHIP INTERESTS, CAPITAL CONTRIBUTIONS, AND CAPITAL ACCOUNTS

3.1     Membership Interests and Capital Contributions.

(a)     Membership Interests.     Equity in the Company shall be classified into two (2) classes of Membership Interests to be issued to the Members: class A units (the "Class A Units") and class B units (the "Class B Units") (sometimes referred to collectively herein as "Units"). The Units shall be certificated or uncertificated, at the Manager's discretion.

(b)     Class A Units. In exchange for capital contributions or other good and valuable consideration provided by Members to the Company prior to or concurrent with the execution of this Agreement, the Company has issued the number of Class A Units (and corresponding Membership Interests) set forth opposite each such Member's name on SCHEDULE B to this Agreement.

(c)     Class B Units. In exchange for capital contributions or other good and valuable consideration provided by Members to the Company prior to or concurrent with the execution of this Agreement, the Company has issued the number of Class B Units (and corresponding Membership Interests) set forth opposite each such Member's name on SCHEDULE B to this Agreement. A Member owning a Class B Unit shall be entitled to distributions in accordance with Section 4.2. Additionally, as agreed upon between the Managers and such Class B Unit owner.

2

3.2    Additional Capital Contributions.

(a)    No Member shall be required to make any additional capital contribution or be liable for any acts or debts of the Company, except as otherwise provided herein or in the Act. However, any Member may make additional capital contributions to the Company at any time upon the written consent of such Member. To the extent that any Member makes an additional capital contribution to the Company, the Manager shall revise Schedule B of this Agreement to reflect such additional capital contribution. The provisions of this Agreement, including this Section 3.2, are intended to benefit the Members and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company and the Members shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

(b)    If at any time from and after the date the Loan is repaid in full, the funds available from the operations of the Company are insufficient to meet the ordinary course cash requirements of the Company as determined by the Manager, then the Manager shall be entitled to cause the Company to either borrow funds from third-party creditors (including Members as creditors), or to sell additional Units to third parties to raise such funds, subject to the preemptive rights of Members set forth in Section 8.5 below. For the avoidance of doubt, the Company shall not borrow funds or incur any additional indebtedness for so long as the Loan remains outstanding.

3.3    Capital Accounts.

(a)    A separate capital account shall be established and maintained for each Member. Each Member's capital account shall be increased by: (i) the amount of money contributed by it to the Company; (ii) the Fair Market Value of property contributed by it to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take pursuant to the provisions of Section 752 of the Code); (iii) the amount of Profits allocated to it (including Profits attributable to Capital Transactions), and shall be decreased by; (iv) the amount of money distributed to it by the Company; (v) the Fair Market Value of property distributed to it by the Company (net of liabilities secured by such distributed property that it is considered to assume or take pursuant to the provisions of Section 752 of the Code); and (vi) the amount of Losses allocated to it (including Losses attributable to Capital Transactions), and shall otherwise be adjusted in accordance with Section 1.704-1(b) of the Regulations.

(b)    The capital accounts of the Members shall reflect revaluations of property in all events in which such revaluation is permissible or required under the Regulations. In the event that the capital accounts of the Members are, in accordance with the preceding sentence, computed with reference to a book value of any asset that differs from its adjusted tax basis, then the capital accounts shall be adjusted for depreciation, depletion, amortization, and gain or loss, as computed for book purposes with respect to such asset in accordance with the Regulations.

(c)    The foregoing provisions, and other provisions of this Agreement relating to the maintenance of capital accounts and allocation of income, gain, loss, deduction and credit, are

3

intended to comply with Regulations Section 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with those Regulations.

3.4    No Withdrawal of Interest.    No Member shall have the right to (a) withdraw all or any part of its capital contribution prior to the dissolution of the Company, (b) receive any return or interest on any part of its capital contribution except as otherwise provided in this Agreement, or (c) withdraw or resign from the Company except (i) with the consent of the Manager, (ii) in the event of termination of its Membership Interest upon the occurrence of a Forfeiting Event pursuant to Section 9.2 below, or (iii) by transfer or other disposition of all of its Membership Interest in accordance with the terms of this Agreement.

3.5    Intentionally Omitted

## ARTICLE IV
## DISTRIBUTIONS

4.1    Distributions of Available Cash from Operations and Net Capital Transaction Proceeds.    Subject to the Manager's discretion and the terms and conditions of the Loan Documents (including, without limitation, Section 3.22 of the Loan Agreement), Distributions shall be made to Members only after the Company has paid all amounts required under the Loan, and, with respect to Available Cash from Operations, paid all Company Costs then due and payable. Distributions shall be made on each Distribution Date to Members to the extent of any Available Cash from Operations. Distributions of Available Cash from Operations collected during each calendar month shall be made on the next succeeding Distribution Date related to Available Cash from Operations (e.g., for Available Cash from Operations collected during the month of April 2021, on May 1, 2021) and at such other times as the Manager shall determine. Distributions of Net Capital Transaction Proceeds shall be made promptly after the Company receives such proceeds.

4.2    General Priority Rules.    Subject to the terms and conditions of the Loan Documents, all distributions of Available Cash from Operations and Net Capital Transaction Proceeds shall be made on each Distribution Date in the following order of priority:

(a)    First, to the Class B Member, until the Class B Member has received an aggregate amount equal to $5,900,000.00;

(b)    Second, to the Class A Member, until the Class A Member has received an aggregate amount equal to $7,400,000; and

(b)    Third, to the Class B Member, in an amount equal to Five Million and Nine Hundred Thousand Dollars ($5,900,000.00);

(c)    Fourth, the balance, if any, to the Class A Members.

## ARTICLE V
## ALLOCATIONS

5.1    Tax Treatment and Allocations.  The Members intend and hereby agree that the Company shall be treated as a partnership for U.S. federal income tax purposes.  Subject to Section 704(c) of the Code, the income, gains, losses, credits and deductions recognized by the Company shall be allocated among the Members, for United States federal, state and local income tax purposes, to the extent permitted under the Code and the Treasury Regulations, in a manner that gives economic effect to the Article 4 and the other relevant provisions of this Agreement.

5.2    Section 754 Adjustments.    To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743 (b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1 (b)(2)(iv)(m)(4), to be taken into account in determining capital accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to capital accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1 (b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

## ARTICLE VI
## MEMBERS: MANAGEMENT:
## LIMITATIONS ON THE COMPANY'S ACTIVITIES

6.1    Members.

(a)    Powers of Members.  The Members shall have only the power to exercise such rights or powers granted to the Members pursuant to the express terms of this Agreement and such rights or powers, if any, as may be required by the Act. Unless otherwise determined by the Manager, and except as otherwise specifically provided by this Agreement or required by the Act, no Member, in his, her or its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, or participate in the management of the Business and affairs of the Company.

(b)    Liability of Members. The Members shall have no liability under this Agreement or otherwise with respect to the debts, liabilities and obligations of any other Member of the Company, except to the extent provided in the Act.

(c)    Member Voting. Except (i) as expressly provided herein; (ii) as otherwise provided in any other agreement between the Company and a Class B Unit holder; or (iii) as otherwise required by the Act, the Class B Unit holders shall have no right to vote on any Company matters or otherwise participate in the management of the Business.

6.2    Management.

5

(a)    Manager.    The Business and affairs of the Company shall be managed by the manager (the "Manager"). The Manager shall hold office as Manager until the Manager's death, resignation or removal pursuant to the terms and conditions set forth herein. The Manager may, but need not, own Membership Interests. The current Manager shall be David Gefner who has been duly appointed pursuant to this Section 6.2(a).

(b)    Manager's Powers. Subject to Section 6.3, the Manager shall have the authority to exercise all the powers of and take all actions on behalf of the Company, except such powers as by law or by this Agreement are conferred upon or reserved to the Members, and in any case shall be exclusively responsible for the day-to-day operation and affairs of the Company and its Business. The Manager shall be entitled to rely on information, opinions, reports or statements of one or more employees or other agents of the Company, or any attorney, accountant or other person as to matters within such person's professional or expert competence.

(c)    Removal. The Manager may be removed during his or her respective term of office by the Members as a result of the Member's good faith determination that the Manager has committed a Forfeiting Event. If the Manager is removed for a Forfeiting Event and at the time of removal was also a Member, then he or she shall not forfeit any Membership Interest owned by him or her; provided that the Company shall have the right to seek any damages from such Member (or any other remedies at law or equity, including, without limitation, injunctive relief) to which it may be entitled as a result of such Member's acts or omissions which constitute or constituted a Forfeiting Event.

(d)    Vacancy.    Subject to and in accordance with the Loan Documents, vacancies created by the death, resignation or removal of the Manager shall be filled with an individual appointed by a majority of the Membership Interests.

(e)    Intentionally Omitted

(f)    Intentionally Omitted

(g)    Intentionally Omitted

(h)    Conflict of Interest. In the event any matter presented to the Manager of the Company involves a matter as to which a Manager would have a conflict-of-interest vis a vis the Company (e.g., the approval of the employment agreement of a Manager), then the Manager shall recuse himself or herself on such matter. In the event that the Manager so recuses himself or herself from voting on a given matter, any action taken by the Members with respect thereto shall require the unanimous vote of the non-recused Members.

6.3    Limitations on the Company's Activities.  Notwithstanding any other provision of this Agreement to the contrary, so long as the Loan is outstanding the Company shall comply with this Section 6.3. In the event of any conflict between the provisions contained in this Section 6.3 and the other provisions of this Agreement, the provisions of this Section 6.3 shall control and

6

govern. All capitalized terms within this Section 6.3 not otherwise defined in this Agreement shall have the meaning ascribed to them in the Loan Agreement.

(a)    Notwithstanding any other provision of this Agreement to the contrary, so long as the Loan is outstanding, the Company may not do any of the following:

(i)    dissolve or liquidate, in whole or in part;

(ii)    consolidate or merge with or into any other entity or convey or transfer its properties and assets substantially as an entirety to any person or entity;

(iii)    amend or cause to be amended Sections 2.3 or 6.3(b) of this Agreement; or

(iv)    take any action that might cause the Company to become insolvent.

(b)    Notwithstanding any other provision of this Agreement to the contrary, for so long as the Loan is outstanding the Company shall:

(i)    maintain its own books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person;

(ii)    hold itself out as being a Person, separate and apart from any other Person;

(iii)    not commingle its funds or assets with those of any other Person;

(iv)    conduct its own business in its own name;

(v)    maintain separate financial statements;

(vi)    pay its own liabilities and expenses out of its own funds;

(vii)    observe all partnership, corporate or limited liability company formalities, as applicable, and complies with the terms of its Authority Documents;

(viii)    pay the salaries of its own employees, if any, and maintain a sufficient number of employees, if any, in light of its contemplated business operations;

(ix)    not guarantee or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(x)    not acquire obligations or securities of any other Person, including its Affiliates, partners, members or shareholders;

(xi)    allocate fairly and reasonably shared expenses, including, without limitation, any overhead for shared office space, if any;

7

(xii)      use separate stationery, invoices, and checks;

(xiii)      maintain an arms-length relationship with its Affiliates on terms that are intrinsically fair and commercially reasonable;

(xiv)      not pledge its assets for the benefit of any other Person or make any loans or advances to any other Person;

(xv)      correct any known misunderstanding regarding its separate identity;

(xvi)      maintain adequate capital for the normal obligations foreseeable in a business of its size and character in light of its contemplated business operations;

(xvii)      enter into transactions with affiliates only on a commercially reasonable basis;

(xviii)      have Authority Documents which have been approved by Lender;

(xix)      not engage in, seek, or consent to the dissolution, winding up, liquidation, consolidation or merger and shall not engage in, seek or consent to any asset sale, transfer of the partnership, membership or shareholder interests, or amendments of its partnership or operating agreement, certificate of incorporation, articles of organization or other organizational document; and

(xx)      file its own tax returns (unless such Person is treated as a "disregarded entity" for tax purposes and is not required to file tax returns or is required to file consolidated tax returns by law);

(xxi)      not and will not have any constituent party that engages in, seeks, or consents to the dissolution, winding up, liquidation, consolidation or merger of such Person, and shall not and will not have any constituent party that engages in, seeks or consents to any asset sale or Transfer (as defined in the Loan Agreement) of the partnership, membership or shareholder interests, of such Person, or amendments or termination of any of its Authority Documents, or the division of such Person into multiple entities or series pursuant to Section 18-217 of the Delaware Limited Liability Company Act or otherwise;

(xxii)      remain Solvent and pay its debts and liabilities from its own assets;

(xxiii)      maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its assets from those of any other Person;

(xxiv)      not permit any Affiliate or constituent party independent access to its bank accounts; and

(xxv)      not have any of its obligations guaranteed by any of its Affiliates, other than pursuant to the Guaranty and the Environmental Indemnity Agreement.

8

(c)    Notwithstanding any other provision of this Agreement to the contrary, the unanimous consent of all Members is required for the Company to:

(i)    institute proceedings to be adjudicated bankrupt or insolvent;

(ii)    consent to the institution of bankruptcy or insolvency proceedings against it;

(iii)    file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy;

(iv)    seek or consent to the appointment of a receiver, liquidator, conservator, assignee, trustee, sequestrator, custodian or any other similar official of the Company or a substantial part of its properties;

(v)    make any assignment for the benefit of creditors;

(vi)    admit in writing its inability to pay its debts generally as they become due;

(vii)    otherwise seek relief under any laws relating to the relief from debts or the protection of debtors generally; or

(viii)    take any action in furtherance of any of the preceding actions.

(d)    So long as the Loan is outstanding, without the prior written consent of Lender and the unanimous consent of all Members, the Company may not amend, alter, change or repeal this Section 6.3.

## ARTICLE VII
## BOOKS OF ACCOUNT, RECORDS AND REPORTS

7.1    Books of Account.    The Manager shall cause the Company to maintain full and accurate books and records at its principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other matters required by the Act. The books and records of the Company shall be open to the reasonable inspection and examination of each Member in person or by his, her or its duly authorized representative at such Member's sole cost any time during regular business hours for any purpose reasonably related to such Member's interest as a Member.

7.2    Information.    The Company shall promptly supply any Member with any information that such Member may reasonably request, including without limitation (a) true and full information regarding the state of the Business and financial condition of the Company and any other information regarding the affairs of the Company, and (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each Fiscal Year.

7.3    Bank Accounts.    All funds received by the Company shall be deposited in the name of the Company in such checking and savings accounts, time deposit or certificates of

9

deposit, or other accounts or instruments at such commercial banks, savings banks and savings and loan institutions as may be designated by the Manager, with one or more signatories appointed by the Manager.

7.4    Tax Returns.  The Manager shall cause all required tax returns of the Company to be prepared and filed, at the Company's expense, in a timely fashion and shall furnish to each Member the information reasonably required to enable it to properly report its distributive share of Company income, gain, loss, deduction or credit for federal, state and local income tax reporting purposes. The Manager shall use reasonable efforts to mail draft copies of all such returns to each Member for his, her or its approval at least ten (10) days prior to the due date of the return, including extensions thereof.

7.5    Tax Status, Tax Matters Partner.  For U.S. federal, state and local income tax purposes, the Company shall be treated in the manner determined by the Manager. As long as the Company has more than one Member, the Class A Members shall appoint a Class A Member who is willing to be designated on the Company's annual federal income tax return and to have full powers and responsibilities as the "tax matters partner" pursuant to Section 6231 of the Code. In the event of an audit of the Company's federal income tax return, the tax matters partner shall promptly advise all Members of the audit and provide each Member with a copy of any final administrative adjustment resulting from such audit.

7.6    Tax Elections. At the reasonable request of any Member (which request shall not be unreasonably withheld or denied), the Manager shall make any and all elections for federal, state and local tax purposes, including, without limitation, any election if permitted by applicable law to adjust the basis of property of the Company pursuant to Sections 754, 734(b) and 743(b) of the Code, or comparable provisions of state or local law in connection with transfers of Membership Interests and distributions of assets of the Company.

## ARTICLE VIII
## TRANSFER OF MEMBERSHIP INTERESTS

8.1    Restrictions on Transferability.  Subject in all events to the terms and provisions of the Loan Documents, except as otherwise provided in this Article no Member may, directly or indirectly, sell, exchange, assign, pledge, grant a security interest, lien or other encumbrance in or against, or otherwise transfer or dispose of any of its Membership Interest (or any interest therein or portion thereof) whether voluntarily or involuntarily (or by operation of law)(all of the foregoing are collectively referred to herein as a "Transfer"), without the prior written consent of the Manager, except that the following Transfers (the "Permitted Transfers") may occur without the consent of the Manager but subject to Section 8.2 below: (a) any Member that is a natural person may Transfer any part of his, her or its Membership Interest to (i) a trust formed for the benefit of such Member or, his or her spouse or his or her direct or indirect lineal descendants (by issue or by law) or (ii) the estate of any Member who is a natural Person upon such individual's death; provided that any such Transfer does not give rise to a default under any obligation of the Company. Any attempted or purported Transfer in violation of the foregoing shall be void and of no effect and shall not terminate the continued membership of such Member or confer any right on the proposed transferee. Any Transfer by a Member Entity of any equity in (or other voting

10

interests in or right to control) a Member Entity, and any issuance by any Member Entity of any equity in (or other voting interests in or right to control) or any issuance of any right to acquire (by exercise, conversion exchange or otherwise) any such equity, voting interest or right to control, and any encumbrance of any kind on any such equity, voting interest or right to control, shall be deemed a Transfer of such Member Entity's Membership Interests and, thus, shall be subject to this Agreement.

8.2    Transferee as a Member.

(a)    Any proposed transferee of any Membership Interests to whom the Manager has consented or is deemed to have consented under this Agreement shall become a substituted Member, and be admitted to all the rights of a Member, only upon the occurrence or satisfaction of all of the following:

(i)    The Manager previously consented thereto in writing (if such written consent is required hereunder) based upon the Manager's determination that such admission would be in, or not opposed to, the best interests of the Company;

(ii)    the satisfaction of such additional requirements as the Manager shall determine, including, (by way of illustration and not by way of limitation):

   a.    Such transferee's acceptance of, and agreement in an executed writing to be bound by, all of the terms and provisions of this Agreement, in form and substance satisfactory to counsel for the Company (such acceptance shall be required by any Permitted Transferee who is not already a Member); and

   b.    The payment of all expenses incurred by the Company in connection with such substitution as a Member (including any Permitted Transferee who becomes a Member).

(b)    From and after the date such transferee becomes a Member, it shall have all of the rights and powers, and be subject to all of the restrictions and liabilities, of its transferor to the extent of the Membership Interest so transferred, but such transfer shall not release the transferor from liability to the Company for any contributions it agreed to make or any other accrued but unperformed obligations it has under this Agreement.

(c)    If, notwithstanding the restrictions in this Agreement on the Transfer of Membership Interests, and without limiting the continuing obligation of each Member (and all transferees thereof) to abide by such restrictions, any Transfer that purports to be effected by operation of law shall be effective (if at all) only with respect to the share of Profits, Losses and distributions of the Company to which the transferor in such Transfer would be entitled with

11

respect to such Membership Interest; and such transferee shall not under any condition or circumstance have (i) any right to participate in the management or affairs of the Company or (ii) any right to vote on, consent to, approve or otherwise take part in any decision of the Members, Manager, officers, or other employees or affiliated Person.

(d)    In the event that any Class A Member transfers any of its Membership Interest pursuant to a Permitted Transfer, such Permitted Transfer shall be effective only with respect to the share of Profits, Losses and distributions of the Company to which the transferor in such Permitted Transfer would be entitled with respect to such Membership Interest; and such transferee shall not under any condition or circumstance have (i) any right to participate in the management or affairs of the Company or (ii) any right to vote on, consent to, approve or otherwise take part in any decision of the Members, Manager, officers, or other employees or affiliated Person.

8.3    Tag Along Rights.

(a)    In the event that the holders of Units representing fifty percent (50%) or more of the aggregate Percentage Interests (the "Disposing Members") receive and accept a written offer from an unaffiliated third party (the "Third Party") to acquire Units representing at least fifty percent (50%) of the Percentage Interests of the Company (the "Primary Sale"), the other Members (the "Other Members") shall have the right to sell or otherwise transfer to the Third Party the same proportionate share of their Membership Interests for the same Unit consideration and upon the same terms and conditions as contemplated by the Primary Sale (the "Tag-Along Sale").

(b)    Not more than five (5) days after their acceptance of the Third Party's offer to purchase their Membership Interests, the Disposing Members shall provide written notice (the "Tag-Along Notice") to the Other Members, setting forth the identity of the Third Party and the terms and conditions of the accepted offer, including the purchase price and the proposed closing date. If any of the Other Members elects to exercise his, her or its right to participate in the Tag-Along Sale, he, she or it shall deliver written notice thereof to the Third Party not later than ten (10) days after his, her or its receipt of the Tag-Along Notice. Receipt of such notice by the Third Party shall create an obligation upon such Third Party to proceed to close the Tag-Along Sale together with the Primary Sale. In the absence of such Third Party's agreement to close the Tag-Along Sale, the Third Party and Disposing Members may not close the Primary Sale. Failure of the Other Members to timely exercise their right to participate in a Tag-Along Sale shall be deemed an irrevocable waiver thereof.

(c)    A Primary Sale shall be subject in all respects to the terms and conditions of the Loan Documents and may not be consummated under this Section 8.3 without the prior written approval of the majority of Membership Interests and Lender.

8.4    Drag Along Rights.

(a)    In the event that the Disposing Members receive and accept a written offer from a Third Party for a Primary Sale, the Disposing Members shall have the right to compel the Other Members to sell or otherwise transfer to the Third Party the same proportionate share of their

12

Membership Interests for the same Unit consideration and upon the same terms and conditions as contemplated by the Primary Sale (the "Drag-Along Sale").

(b)    Not more than five (5) days after their acceptance of the Third Party's offer to purchase their Membership Interests, the Disposing Members shall provide written notice (the "Drag-Along Notice") to the Other Members, setting forth the identity of the Third Party and the terms and conditions of the accepted offer, including the purchase price and the proposed closing date. Receipt of such Drag-Along Notice by the Other Members shall create an obligation upon such Other Members to proceed to close the Drag-Along Sale together with the Primary Sale.

(c)    A Primary Sale shall be subject in all respects to the terms and conditions of the Loan Documents and may not be consummated under this Section 8.4 without the prior written approval of a majority of the Membership Interests and Lender.

8.5    Preemptive Rights.    Subject to the terms and conditions of the Loan Documents and this Section 8.5, the Company hereby grants to each Member a right of first offer (the "Preemptive Rights") with respect to the issuance and sale by the Company of Membership Interests, whether Class A Units or Class B Units or any other class of units representing Membership Interests.

(a)    Each time the Company proposes to issue or offer any Membership Interest, the Company shall first make an offering of such unit Interest to each Member in accordance with the following provisions:

(i)    Not less than thirty (30) days prior to the anticipated closing thereof, the Company shall deliver a Preemptive Rights notice in accordance with this Section 8.5 (the "Preemptive Rights Notice") to each Member stating (A) its bona fide intention to offer such Membership Interests, (B) the number of such Membership Interests to be offered, and (C) the price and terms upon which it proposes to offer such Membership Interests;

(ii)    By written notification to the Company by a Member within five (5) Business Days after delivery of the Preemptive Rights Notice to such Member, such Member may elect to purchase or obtain, at the price and on the terms specified in the Preemptive Rights Notice, up to that portion of Membership Interests which are the subject of such notice that equals the proportion of Membership Interests issued and held by such Member in the Company, on a fully diluted basis; and

(iii)    If all Membership Interests that each Member is entitled to purchase pursuant to this Section 8.5 are not elected to be purchased as provided in this Section 8.5, the Company may, during the sixty (60) day period following the expiration of the period provided in this Section 8.5, offer the remaining unsubscribed portion of such unit Interests to any Person or Persons (including any Class A Unit holder or Class B Unit holder who has elected to exercise its Preemptive Rights) at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Preemptive Rights Notice. If the Company does not enter into an agreement for the sale of the unit Interests within such period, or if such agreement is not consummated within thirty (30) days

13

of the execution thereof, the right provided hereunder shall be deemed to be revived and such unit Interests shall not be offered unless first re-offered to the Members in accordance herewith.

(b)    Notwithstanding anything to the contrary in Section 8.5(a) above or elsewhere in this Agreement:

(i)    The Preemptive Rights granted in Section 8.5(a) shall not be applicable (and do not vest) with respect to the issuance by the Company of incentive units to: (A) one or more employees or independent contractors of the Company as consideration, in whole or in part, for services performed on behalf of the Company; (B) vendors, in consideration for goods and services provided to the Company by such vendors; or (D) strategic partners in connection with a bona fide business transaction with the Company for other than primarily equity financing purposes; and

(ii)    The holder of a Class A Unit shall have no right to purchase any Class B Units of the Company at any time unless such holder already owns a Class B Unit.

## ARTICLE IX
### WITHDRAWAL

9.1    Withdrawal of a Member. Subject in all events to the terms and conditions of the Loan Documents, except as otherwise provided in this Article no Member may voluntarily withdraw or resign from the Company. Any Member may withdraw only with the consent of, and upon such terms and conditions as determined by a majority of the Membership Interests. A withdrawn Member shall in all events be entitled to be paid an amount equal to the Fair Market Value of its Membership Interest at the time of its withdrawal from the Company. Such amount shall be payable within sixty (60) days of such event.

9.2    Required Withdrawals. Subject in all events to the terms and conditions of the Loan Documents, a majority of the Membership Interests the Members shall have the right, in their sole iscretion, to require a Member to withdraw from the Company at any time upon the occurrence of a Forfeiting Event by giving such Member notice of such required withdrawal, which notice shall specify in reasonable detail the reason for such required withdrawal. Such withdrawal shall be effective upon receipt by such Member of such notice.

## ARTICLE X
### DISSOLUTION AND TERMINATION

10.1    Dissolution.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following:  (i) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.  Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company (other

than upon continuation of the Company without dissolution upon an assignment by the last remaining Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 8.1 and 8.2), to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such Member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the bankruptcy of the last remaining Member shall not cause such Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Member(s) in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

10.2    Distribution of Assets Upon Dissolution. Upon the winding up of the Company, the assets of the Company shall be distributed as follows:

(a)    First, to creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company; and

(b)    Second, to the Members as provided in Article IV hereof.

10.3    Cancellation of Certificate of Formation. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provision has been made therefor and all of the remaining property and assets of the Company have been distributed to the Members, any Member may cancel the Certificate of Formation pursuant to the Act.

10.4    Winding Up. Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its capital contribution. If the assets remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return the capital contribution of each Member, such Member shall have no recourse against any of the other Members. The winding up of the affairs of the Company and the distribution of its assets shall be conducted by the Members in accordance with the Act, and they may take all actions necessary to accomplish such distribution, including without limitation, selling any assets of the Company.

ARTICLE XI
NON-PUBLIC INFORMATION

Each Member shall forever maintain the confidentiality of Non-Public Information and shall not disclose any Non-Public Information to any Person except their respective professional

15

advisors who are obligated to maintain the confidentiality of such information or as is necessary to perform her, his or its duties as an employee, officer or Manager of the Company (as applicable), and then only upon receiving the written consent of the Company to make such disclosure. As used in this Section, "Non-Public Information" means information that is clearly marked by the Company as "confidential" or "proprietary" or that a reasonable person would understand to be of a confidential or proprietary nature, including (but not limited to) the terms of this Agreement and information relating to the Company's assets, properties, third-party contracts (including, but not limited to, contracts with employees and independent contractors), intellectual property, finances, business processes, designs, sales, marketing plans, suppliers, customers, markets, pricing, litigation and other legal matters, and all other non-public information regarding the Company or the Business (and all information of or concerning any other Member that would constitute Non-Public Information if belonged to the Company). Non-Public Information does not include information that (i) was publicly known at the time such Member receives such information pursuant to this Agreement or (ii) subsequently becomes publicly known through no act or omission by such Member.

ARTICLE XII
COMPANY PROPERTY

All Company Property is and shall be the sole and exclusive property of the Company and its Affiliates. As used in the this Article, "Company Property" means all statutory and common law trademarks, service marks, trade names, logos, brand names, trade secrets, domain names, rights of publicity, internet website(s), slogans, licenses, know-how, designs, copyrights (licensed or owned), inventions (whether or not patented or patentable), patents (licensed, owned or applied for), patent applications and any other intellectual property heretofore used or as presently contemplated to be used in connection with the Company, its Affiliates, or its Business, all registrations and applications to register any of the foregoing, and all related brand publicity, and all of the goodwill associated with any of the foregoing and any causes of action relating to past or current infringement of any of the foregoing, and all correspondence, drawings, materials, records, documents, promotional materials, notes, studies, calculations, reports, contracts, agreements, accounts receivable, and other written or graphical materials relating to the Company, its Affiliates, or its Business, in whatever form, and all clients, customers, contact information, hardware, software, ideas, inventions, discoveries, know-how, processes, methods, information, data and any other tangible or intangible property of the Company or its Affiliates (including Non-Public Information). All rights in works of whatever kind created by any Member or Manager for and in the service of the Company shall also be deemed Company Property hereunder. All Company Property created, in whole or in part, by any Member or Manager shall be deemed "works made for hire" within the meaning of Section 101 of the U.S. Copyright Act (as amended). If, for any reason, all or any part of such Company Property are not considered "works made for hire" pursuant to any law, regulation, ruling or judicial decision, or if the provisions of this Section do not otherwise operate to vest title to all such Company Property and all intellectual property rights thereto in and to the Company, then each Member or Manager hereby assigns all rights in and to such Company Property to the Company free and clear of all encumbrances and without further compensation.

16

## ARTICLE XIII
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Each Member, acknowledging that the other Members, the Manager, and the Company are reasonably relying herein, hereby represents and warrants, severally and not jointly, to the Company and the other Members and the Manager, as of the date of the admission of such Member to the Company, as follows:

13.1    Suitability.    The Member has sufficient financial resources available to support the loss of all or a portion of its investment in the Company, has no need for liquidity in the investment in the Company and is able to bear the economic risks of the investment in the Company. The Member itself or through its advisors is sophisticated, knowledgeable and experienced in financial, business and investment matters, and, as a result, is in a position to evaluate the merits and risks of an investment in the Company. The Member, either alone or with its professional advisors, has the capacity to protect its interests in the Company.

13.2    For Investment Purposes.    The Member has acquired the Membership Interest for such Member's own account, for investment only and not with a view to the distribution thereof, except to the extent provided in or contemplated by this Agreement.

13.3    No Registration.    The Member understands that the Membership Interests have not been registered with the Securities and Exchange Commission under the Securities Act or under similar laws of any states in reliance upon exemptions under those acts. The sale or other disposition of the Membership Interests is restricted as provided in this Agreement.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    Entire Agreement; Amendments.    This Agreement represents the entire agreement of the parties hereto with respect to its subject matter and supersedes any and all other agreements and understandings, whether express or implied, written or oral. Without limiting the generality of the foregoing, any and all other prior or contemporaneous agreements or other writings and discussions or negotiations that purports to be an "operating agreement," "limited liability company agreement," or similar agreement (whether by designation or substance) is hereby deemed merged into this Agreement and superseded in its or their entirety. Any amendment hereto shall be in writing and require the approval of all Members, except to the extent such amendment will not have a material adverse effect on the rights and interests of such Members. Notwithstanding anything to the contrary in this Agreement, so long as the Loan is outstanding this Agreement may not be modified, altered, supplemented or amended without Lender's prior written consent, except to reflect any change in capital accounts, contributions, distributions, or allocations provided that the Company remains a single purpose entity.

14.2    Notices. Any notice, distribution, demand or other communication required or permitted to be given under this Agreement must be in writing and will be deemed to have been received by the party to whom it was properly addressed and delivered (a) on the date when

17

actually delivered if delivered by hand by the sender to the indented recipient, or (b) the date
actually delivered if sent by nationally recognized overnight delivery service, as shown by
confirmation of delivery provided by such service; in each case delivered, if to the Company, at
its principal office, and if to any Member, at its address set forth in the books and records of the
Company. It shall be every Member's responsibility to ensure that the Company has on file his,
her, or its current mailing address.

14.3    Further Assurance.    Each Member shall execute such other documents and take
such further action as the other Members deem reasonably necessary or appropriate to effectuate
the intent of this Agreement.

14.4    Construction.    As used in this Agreement, the singular shall include the plural, and
the masculine shall include the feminine and neuter and vice versa, as the context requires.

14.5    Headings.    The headings in this Agreement are inserted for convenience only and
shall not in any way define or affect the meaning, construction or scope of any provision of this
Agreement.

14.6    Binding Effect.    Subject to the provisions of this Agreement restricting transfers of
Membership Interests, this Agreement shall be binding upon, and shall inure to the benefit of, the
parties and their respective heirs, personal representatives, successors and permitted assigns.

14.7    Waivers.    Neither the waiver by any Member of a breach of or a default under any
provision of this Agreement, nor the failure of any Member on one or more occasions to enforce
any of the provisions of this Agreement or to exercise any right, remedy or privilege hereunder,
shall be construed as a waiver of any subsequent breach or default of a similar nature or as a waiver
of any such provision, right, remedy or privilege.

14.8    Exercise of Rights.    No failure or delay on the part of any Member or the Company
in exercising any right, power or privilege under this Agreement and no course of dealing between
the Members or between any Member and the Company shall operate as a waiver thereof, nor shall
any single or partial exercise of any right, power or privilege preclude any other or further exercise
thereof or the exercise of any other right, power or privilege. The rights and remedies provided in
this Agreement are cumulative and not exclusive of any other rights or remedies which a Member
or the Company would otherwise have at law or in equity.

14.9    No Third-Party Beneficiary.    This Agreement is for the benefit of the Members and
the Company and except as otherwise expressly provided in this Agreement, no other Person shall
have any rights, interest or claims under this Agreement or be entitled to any benefits under or on
account of this Agreement as a third-party beneficiary or otherwise. Notwithstanding any provision
to the contrary contained herein, Lender is an intended third-party beneficiary of this Agreement
and may enforce the provisions herein.

14.10    Governing Law and Partial Invalidity.    This Agreement shall be governed by and
construed in accordance with the laws of the State of Delaware, without regard to its conflicts of
law provisions. If any part of this Agreement shall be held invalid for any reason, the remainder

18

of this Agreement shall continue in full force and effect.

14.11    Jurisdiction and Venue. Each Member hereby irrevocably consents to the to the exclusive personal jurisdiction of the federal and state courts located in the State of Delaware, in any action to enforce or interpret any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue or forum non conveniens to any such action brought in either of those courts. To the fullest extent permitted by law, the Members hereby waive trial by jury in any such action.

14.12    No Partnership. Each Member acknowledges that the Company was formed under the Act, and not as a partnership, either general or limited, except for U.S. federal, state and local income tax purposes. No Member intends to be a partner to any other Member, or partners as to any third party. To the extent any Member, by word or action, represents to another Person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.13    Survival.  Any provision hereof relating to indemnification, confidentiality and nondisclosure, equitable remedies, and any other provision hereof that either expressly requires survival of, or by its nature may reasonably be presumed to survive, any termination or expiration hereof or any part of the Membership Interest of a Member, the employment or other relationship of a Person with the Company or the dissolution of the Company, shall survive such expiration or termination to the extent expressly provided herein or, if not so provided, in perpetuity.

14.14    Equitable Remedies.  In the event of a breach or threatened breach of any of the provisions of this Agreement (including, but not limited to, any provision herein pertaining to confidential information, indemnification, and fiduciary obligations), the Person against whose interest such breach was committed or threatened shall be entitled, in addition to any other rights or remedies available to it arising out of such breach, to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, without being required to post a bond or other security or having to prove or allege the inadequacy of available remedies at law. Notwithstanding the passing of any period of time after which specific performance shall be unavailable or materially ineffective, the person against whose interest such a breach was committed or threatened shall continue to have the right to obtain any other available right or remedy of whatever kind or nature.

14.15    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

14.16    Waiver of Partition: Nature of Interest.  Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Members hereby irrevocably waives any right or power that such Person might have to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 4 hereof.  The

19

Interest of each Member in the Company is personal property.

This Space Intentionally Left Blank

20

The undersigned, being, or desiring to become, a Member of 291 Perigrove 1001, LLC, hereby agrees to all of the terms of the Operating Agreement of 291 Perigrove 1001, LLC dated as of April __, 2021 and agrees to be bound by the terms and provisions thereof.

INDIVIDUAL MEMBERS

LL Livingston Management LLC

By: _____
Name: David Gefner
Title: Authorized Signor

GWK Livingston Management LLC

By: _____
Name: David Gefner
Title: Authorized Signor

Livingston Common Members LLC

By: _____
Name: David Gefner
Title: Authorized Signor

GWK Livingston LLC

By: _____
Name: David Gefner
Title: Authorized Signor

## Schedule A

As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time.

"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly Controlling, Controlled by or under Common control with such Person, (ii) any Person owning or controlling 10% or more of the outstanding voting interests of such Person, (iii) any officer, director, or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of 10% or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence.

"Agreement" means this Operating Agreement as originally executed and as amended from time to time.

"Available Cash from Operations" means, at the time of determination, cash (including demand deposits and marketable securities) generated from revenues from the Company's operations, after provision has been made for (i) all Company Expenses, (ii) reinvestment of Profits into the Company and (iii) such amounts as the Manager shall deem reasonable in order to provide for any anticipated, contingent or unforeseen expenditures or liabilities of the Company. Available Cash from Operations shall be determined without regard to (x) capital contributions made by Members or (y) principal advanced on Company indebtedness.

"Business" means the carrying on of any and all activities necessary, desirable, convenient or appropriate in connection with (i) the ownership of all limited liability company interests in each of Holdings and Perigrove, and (ii) obtaining the Loan and the performance of the Company's obligations under the Loan Documents and all documents, agreements, certificates and financing statements contemplated thereby or related thereto.

"Business Day(s)" means Monday through Friday of each week, unless such day is a legal holiday recognized as such by the State of New York.

"Capital Transaction" means (i) any sale, exchange, insurance award, condemnation or other similar transaction relating to the Business, (ii) any refinancing of any indebtedness of the Company, and (iii) any other transaction which, in accordance with U.S. generally accepted accounting principles, would be treated as a capital event.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on April 16, 2021, as amended or amended and restated from time to time.

"Company" has the meaning set forth in the first preamble clause of this Agreement.

"Company Property" has the meaning set forth in Article XII.

22

"Class A Member" means a Person owning Class A Units.

"Class A Units" has the meaning set forth in Section 3.1(a).

"Class B Member" means a Person owning Class B Units.

"Class B Units" has the meaning set forth in Section 3.1(a).

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or corresponding provisions of succeeding laws).

"Company Expenses" means all reasonable fees, expenses, costs, liabilities and obligations of the Company or otherwise incurred by the Manager or his/her agents or representatives on behalf of the Company. Company Expenses shall include, but shall not be limited to, the following: (i) all reasonable fees and expenses of custodians, outside counsel, accountants and other third party professionals; (ii) expenses incurred in connection with the operations and activities of the Company, including without limitation salaries, bonuses and all costs associated with any financing relating to the Business; (iii) all taxes, fees and governmental charges levied against the Company; and (iv) all indemnification expenses of the Company, including expenses incurred by or on behalf of the indemnified party in seeking indemnification from the Company pursuant to this Agreement.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms "controlled", "controlling" and "common control" shall have correlative meanings.

"Disposing Members" has the meaning set forth in Section 8.3(a).

"Distribution Date" shall mean, (i) with respect to Available Cash from Operations, the first calendar day of each month and if such day is not a Business Day, the immediately preceding Business Day, and (ii) with respect to Net Capital Transaction Proceeds, promptly after the Company or Property Owner receives such proceeds, but in any event within ten (10) Business Days of such receipt.

"Drag-Along Notice" has the meaning set forth in Section 8.4(b).

"Drag-Along Sale" has the meaning set forth in Section 8.4(a).

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative association, foreign trust or foreign business organization.

"Fair Market Value" on any date, of any assets owned by the Company, shall mean, in the case of cash, the amount of cash and, in the case of any other asset, the fair market value of such

asset as determined by a majority of the Membership Interests in their reasonably good faith discretion. The Fair Market Value of property subject to liens shall be the fair market value of such property less the amount of such liens.

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

"Forfeiting Event" or "Cause" means for any Member or Manager (i) the Member or Manager is in breach of Section 6.3 or Article VIII Article XI or Article XII of this Agreement and/or (ii) the Member or Manager has been convicted of a felony.

"Holdings" means 291 Livingston Holdings LLC, a New York limited liability company.

"Lender" means WU 291 Realty LLC, a New York limited liability company, together with its successors and/or assigns.

"Loan" means that certain mezzanine loan in the original principal amount of $3,500,000.00 made by Lender to the Company as of the date hereof, as evidenced by the Loan Documents.

"Loan Agreement" means that certain Loan Agreement, dated as of the date hereof, by the Company and Lender, as the same may be amended or modified from time to time.

"Loan Documents" means (i) the Loan Agreement, (ii) that certain Promissory Note, dated as of the date hereof, in the original principal amount of $3,500,000.00 made by the Company to the order of Lender, (iii) that certain Pledge Agreement, dated as of the date hereof, made by the Company for the benefit of Lender, and (iv) any other document previously, simultaneously or hereafter delivered to Lender evidencing, securing, or in connection with the Loan, as the same may be amended or modified from time to time.

"Manager" has the meaning set forth in Section 6.2(a).

"Member" means the undersigned and any other Person who owns a Membership Interest (whether Class A Units or Class B Units) and is subsequently admitted to the Company as a Member as provided in this Agreement but does not include any Person who has ceased to own a Membership Interest.

"Member Entity" means a Member that is an Entity.

"Membership Interest" or "Interest" means a Member's entire Percentage Interest in the Company, including the Member's right to share in Profits and Losses and to receive distributions from the Company, and all other rights of a Member under this Agreement or of a member of a limited liability company under the Act.

"Net Capital Transaction Proceeds" means amounts made available to the Company from (1) any refinancing of the properties and/or assets or any part thereof, including the Company's direct or indirect membership interest in Holdings, Perigrove or the Property Owner, (2) any taking or loss (including the proceeds from any foreclosure, conveyance in lieu thereof or title or

24

casualty insurance policies) of the Property or any part thereof or the Company's membership interest in Holdings, Perigrove or the Property Owner, and (3) the sale of the entire Property after, without duplication, payment of or reserves for any transaction costs therefor unless prohibited from being distributed to the Company under the Loan Documents.

"Non-Public Information" has the meaning set forth in Article XI.

"Other Members" has the meaning set forth in Section 8.3(a).

"Percentage Interest" means, with respect to any Member, the percentage ownership interest in the Company held by such Member, relative to all other Members.

"Perigrove" means Perigrove 1001 LLC, a New York limited liability company.

"Permitted Transfers" has the meaning set forth in Section 8.1.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such Person where the context so indicates.

"Preemptive Rights" has the meaning set forth in Section 8.5.

"Preemptive Rights Notice" has the meaning set forth in Section 8.5(a)(i).

"Primary Sale" has the meaning set forth in Section 8.3(a).

"Profits" and "Losses" mean, for each Fiscal Year, the taxable income or loss of the Company for such Fiscal Year determined in accordance with Section 703(a) of the Code, plus any income exempt from federal income tax under the Code, and less any expenditures not deductible in computing such income or loss and not properly chargeable to capital account under the Code.

"Property" means that certain real property located at 291 Livingston Street, Brooklyn, New York and designated as Block 161, Lot 61, Kings County, New York.

"Property Owner" means Hello Livingston Extended LLC, a New York limited liability company.

"Regulations" means the Income Tax Regulations, including temporary regulations, promulgated under the Code, as amended from time to time.

"Tag-Along Notice" has the meaning set forth in Section 8.3(b).

"Tag-Along Sale" has the meaning set forth in Section 8.3(a).

"Third Party" has the meaning set forth in Section 8.3(a).

25

"Transfer" has the meaning set forth in Section 8.1.

"Units" has the meaning set forth in Section 3.1(a).

26

## Schedule B

Capitalization Table for 291 Perigrove 1001, LLC as of April __, 2021

### Class A

| Member Name | Number of Class A Units | Percentage Interest in 291 Perigrove 1001, LLC |
|---|---|---|
| Livingston Common Members LLC | 55.6391429 | 38.9474% |
| GWK Livingston LLC | 44.6308571 | 31.0526% |
| Totals | 100 | 70% |

### Class B

| Member Name | Number of Class B Units | Percentage Interest in 291 Perigrove 1001, LLC |
|---|---|---|
| LL Livingston Management, LLC | 33.3333333 Class B | 10% |
| GWK Livingston Management LLC | 66.6666667 Class B | 20% |
| Totals | 100 | 30% |

27